John W. RANKIN, Appellant,

v.

BLUE GRASS BOYS RANCH, INC.,
Appellee.

Ann Caskey COWGILL, Appellant,

v.

John W. RANKIN, Appellee.

Court of Appeals of Kentucky.

July 2, 1971.

Thomas H. Burnett, Gerry L. Calvert, Lexington, for John W. Rankin.

John L. Davis, Stoll, Keenon & Park, Lexington, for Blue Grass Boys Ranch, Inc.

Charles Landrum, Jr., Landrum & Patterson, Charles L. Calk, Gess, Mattingly, Saunier & Atchison, Frank G. Dickey, Jr., Lexington, for Ann Caskey Cowgill.

DAVIS, Commissioner.

Shortly after 5 a. m. on January 8, 1968, a dairy truck operated by John W. Rankin struck a mule owned by Blue Grass Boys Ranch, Inc.; the mule was being wintered on the farm of Ann Caskey Cowgill. Rankin was operating the truck eastwardly along U. S. Highway 60; he sustained personal injuries in the accident and sued Mrs. Cowgill and Blue Grass Boys Ranch, Inc., seeking compensation on account of those injuries. The trial court granted a directed verdict in favor of Blue Grass Boys Ranch and submitted to the jury the issue of the liability of Mrs. Cowgill. The jury returned a verdict for Rankin against Mrs. Cowgill for $133,109.70. Rankin has taken an appeal from the judgment in favor of Blue Grass Boys Ranch, which is numbered W–150–70. Mrs. Cowgill has appealed from the judgment against her (W–206–70). Both of the appeals will be disposed of in this opinion.

■ Before relating the detailed claims of the parties, it is appropriate to deal with Mrs. Cowgill's motion to strike the brief of Rankin as being in violation of RCA 1.260. The motion to strike the brief was passed to the consideration of the case upon its merits. It is unnecessary to detail the alleged violations of RCA 1.260. Some of the matter presented and argued in Rankin's brief was not within the material contained in the record and properly should not have been presented in the brief. To some extent the same thing is true as to some of the material in the brief for Mrs. Cowgill. The presentation of extraneous material in briefs is improper, but not always sufficiently palpable to warrant the drastic relief urged by Mrs. Cowgill.

Upon full consideration of the matters complained of, the court has concluded that there is no merit in the motion to strike the brief of Rankin; wherefore, the motion is overruled. It is appropriate to observe that the court has not considered extraneous matter in reaching its decision upon the merits.

In the appeal of Mrs. Cowgill against Rankin, the following assignments of error are presented: (1) A directed verdict for Mrs. Cowgill should have been given, because Rankin failed to sustain his burden of proving negligence on her part; (2) the trial judge's control of *voir-dire* examination prejudicially deprived Mrs. Cowgill of a fair trial; (3) the trial judge's attitude was such as to disclose bias on the part of the court and affected Mrs. Cowgill's right to a fair and impartial trial; (4) the trial court erroneously excluded from evidence the fact that Rankin had lost no wages from the date of the accident to the day of the trial; and (5) the verdict is excessive.

■ Mrs. Cowgill recognizes that by reason of KRS 259.210(1) and (2), as construed by this court in Wigginton & Sweeney v. Bruce's Guardian, 174 Ky. 691, 192 S.W. 850, and Ellington v. Strader, Ky., 285 S.W.2d 497, the unexplained presence of livestock on the highway creates against the owner or custodian of the livestock a rebuttable presumption of negligence which will entitle an injured plaintiff to a directed verdict as to the defendant's negligence, unless the animal's keeper adduces rebutting evidence on that issue.

■ The evidence disclosed that a pony and a mule, both owned by Blue Grass Boys Ranch, had been turned into a pasture on the Cowgill farm on December 28, 1967. Both of these animals were on the public highway on the bitterly cold morning of January 8, 1968, as Rankin was driving along. He saw the pony on his left, but did not see the mule which ran onto the road from Rankin's right as Rankin was less than twenty feet from the animal. When Rankin proved these facts, he made

out a prima-facie case against Mrs. Cowgill and the Boys Ranch, owner of the animals. Mrs. Cowgill introduced testimony, which was not contradicted, that the fencing on her entire farm was in excellent condition and sufficiently strong and high to restrain livestock, including the mule involved in this controversy. It was also shown that the animals necessarily had to pass through three gates to reach the highway, unless they escaped from the pasture in some other manner. According to the evidence, the gates were shut and in good condition. Mrs. Cowgill testified that all of the gates were closed when she retired on the night of January 7, 1968. Some question was raised as to her opportunity to observe whether the gates in fact were closed.

Mrs. Cowgill was not at home when the animals were delivered to her farm. In fact, Mrs. Cowgill had not seen either of them at any time after they were transferred to her farm until after the accident occurred. It was shown that the field in which the animals were placed had a good stand of bluegrass in it and that a water hydrant was situated there. However, there was no showing that any person had furnished water to the animals, and apparently the only water source was from the hydrant. The evidence showed that nearly three inches of snow had fallen on December 28, 1967, and that an additional 7.8 inches had fallen on December 31. At the time of the accident it appears that the depth of snow in the fields was approximately two inches. There is some dispute as to whether the roads were icy, but whether they were so or not is of no significance here.

Rankin introduced evidence from an experienced farmer acquainted with the propensities of livestock, tending to show that a mule or pony left in a pasture covered by snow, and without food or water being furnished, would seek to escape in order to reach food and water. There was no direct evidence as to how these animals escaped from their enclosure and found their

way to the highway. For Rankin it is argued that it would have been a relatively simple matter for Mrs. Cowgill to have investigated shortly after the accident and thus have learned how the animals escaped. It was pointed out by Rankin that the snowy ground would have revealed the tracks of the animals in such a way as to dispel the mystery of how they got out. Mrs. Cowgill maintains that it was not incumbent upon her to show how the animals escaped so long as she presented evidence that her fences and gates were in a proper state of repair and maintenance.

In Ellington v. Strader, Ky., 285 S.W.2d 497, in discussing the question of evidence necessary to be presented by the owner of an escaped animal, after a prima-facie case has been made, it was said:

> "After the plaintiffs established that the accident happened and offered proof that the defendant owned the guilty cow, it seems to us that it would not be unreasonable to require the owner of the cow, who had peculiar means of access to the facts as to how the cow got out, to make those facts known to the court. Such procedure is much more logical and sensible than to require the plaintiffs to offer proof as to how the cow escaped." Id., 285 S.W.2d 498.

In Sparks v. Doe, Ky., 379 S.W.2d 252, the just-quoted passage from Ellington was made the basis for a contention by the plaintiff that the owner's failure to affirmatively establish how the animals escaped entitled the plaintiff to a directed verdict. The court rejected that concept. In Sparks v. Doe, there was conflict in the evidence as to the state of repair of the fencing. The court held that a jury issue was presented. In the present case there is no evidence of any defective fencing, but there is the unexplained presence of the animals on the road. In addition, there is the testimony suggesting that animals restrained in the circumstances present here would tend to escape. The statement by Mrs. Cowgill that she knew the gates were

closed on the night before the accident is not a conclusive statement of fact, because it was made by a party to the action, Bullock v. Gay, 296 Ky. 489, 177 S.W.2d 883, and because a substantial question exists as to her opportunity to observe whether the gates were closed in the circumstances. Also it must be remembered that Mrs. Cowgill had no personal knowledge as to the whereabouts of either of the animals on her farm before the accident occurred. There was no testimony presented in behalf of Mrs. Cowgill indicating whether the gates were open or closed immediately after the accident, nor was there any evidence of any attempt by her or in her behalf to ascertain how these animals escaped onto the highway. In all these circumstances, an issue existed as to whether Mrs. Cowgill had exercised ordinary care to restrain the animals; the court properly submitted that issue to the jury. In reaching this conclusion the court has considered the many authorities presented in behalf of Mrs. Cowgill, some of which will be discussed.

 It is noted that in Hartford Insurance Group v. Massey, Miss., 216 So.2d 415, and in Pongetti v. Spraggins, 215 Miss. 397, 61 So.2d 158, the court ruled that the defendant was entitled to a directed verdict when he had shown by testimony, which was neither disputed nor discredited, that he had used all proper means to prevent the animals from escaping and that the animal was on the highway without fault on the part of the owner or the keeper. In those cases the Mississippi Supreme Court observed that the plaintiff's cause of action sounded in negligence and that the defendant had completely overcome any inference or presumption of negligence by the quantum of evidence presented. The Mississippi court observed in Pongetti that it was not necessary for the defendant to show how the calf had escaped in order to exculpate himself from blame. Taken in the abstract, that observation may be sound. On the other hand, the failure of the defendant to offer any reasonable explanation for the escape of the animals, when considered in light of all the surrounding circumstances, may be sufficient to warrant submission of the negligence question to the jury.

It is argued for Mrs. Cowgill that the evidence in her behalf was so compelling that it completely destroyed the "rebuttable presumption" which arose when it was shown that the animals were at large. Mrs. Cowgill's brief cites the colorful language found in Prosser, Law of Torts, Third Edition, pages 214–215, dealing with the effect and nature of presumptions in which it is said in part:

"* * * When persuasive evidence to the contrary is introduced, the occasion for the presumptions, as rules of law, is gone, and they simply cease to exist, 'like bats of law flitting in the twilight, but disappearing in the sunshine of actual facts.' All that remains is whatever inference from ordinary experience is to be drawn from the facts, which has whatever probative value the facts may justify.

"There are, however, other presumptions which obviously are imposed in part as a matter of policy, to compel persons in a position of special responsibility to disclose evidence within their control, under penalty of a procedural disadvantage in the case if they do not. They are, in other words, 'smoking out' presumptions, designed to bring about a result rather than to give effect to probabilities. Such, for example, are the presumptions that when goods are delivered to a bailee in good condition, and are either not returned or returned in bad condition, the loss or damage is due to the negligence of the bailee; that when a passenger is injured by a cause within the carrier's control the carrier has been negligent; and that when goods are damaged in transit over a series of carriers, the last carrier has caused the damage. Quite frequently careless use of language, or genuine confusion, has led to a statement of such presumptions

in terms of a 'burden of proof' upon the defendant, rather than the mere 'burden' of going forward with the production of evidence under penalty of a direction on the issue. Some writers have contended that the policy underlying such presumptions can only be carried out by allowing them to persist in the face of contrary evidence, or by shifting the burden of proof to the adverse party and requiring a preponderance of the evidence to overthrow the presumption. Others consider that the policy may be sufficiently served by instructing the jury that they must apply the presumption unless they believe the contrary evidence. The writers, if not all of the courts, seem to have agreed that in any case a presumption, as a rule of law applied in the absence of evidence, is not itself evidence, and can no more be balanced against evidence than two and a half pounds of sugar can be weighed against half-past two in the afternoon."

It would appear that the "smoking out" policy referred to by Professor Prosser is sufficiently applicable to a keeper of animals as to prevent a directed verdict in favor of the keeper of animals who fails to offer evidence demonstrating that the animal's escape was not his fault, and does not explain why such evidence was unavailable.

It is vigorously argued that the jury was permitted to speculate on the basis of an inference of Mrs. Cowgill's negligence which lacked evidentiary support except for the basic fact that the mule was on the highway. It is suggested in Mrs. Cowgill's brief:

"It is just as speculative that (1) the mule jumped the fence, (2) a trespasser let the mule out, (3) or that the defendant Cowgill was lying and the gates were not closed. There is an inference, under the testimony of the deputy sheriff expert, that the mule would be hungry. That infers that the mule might get out. This infers that the mule could unlock the gate. This infers that the mule could jump the fence. There are many inferences that may be taken from this evidence, but a jury shall not be permitted to speculate."

The court is of the view that the "speculation" suggested in behalf of Mrs. Cowgill is not within the ambit of forbidden speculation. Rather, all of the proven facts, considered along with the unexplained escape of the animals, furnish a basis for a jury's belief, based on reasonable probability, that the animals escaped by reason of Mrs. Cowgill's failure to exercise ordinary care to prevent their escape.

The second ground of error assigned by Mrs. Cowgill is her contention that the trial judge so controlled the *voir-dire* examination of the prospective jurors as to deprive her of a fair trial. This assignment of error relates to more than one aspect of the *voir-dire* proceedings.

■ Four members of the panel were excused for cause at the instance of Rankin. No objection to that action of the court was made. No question is preserved for appellate review in the absence of timely objection. The conduct of the judge was not of the type held to dispense with the necessity of objection within the rationale of Collins v. Sparks, Ky., 310 S. W.2d 45.

■ Counsel for Rankin asked venireman Bradley:

"Now we have asked in this case for a quarter million dollars damages. Would it embarrass you to bring back a verdict in the amount of a quarter million dollars in favor of Mr. Rankin?"

Counsel for Mrs. Cowgill objected to the form of that question, but the objection was overruled. Then during further examination of the panel, counsel for Rankin again inquired of a venireman whether it would be embarrassing for the prospective juror to return a verdict of a quarter million dollars against Mrs. Cowgill. At that

point the trial judge interrupted and stated:

"Mr. Burnett (Rankin's counsel), I think assuming that the evidence and the instructions—"

Mrs. Cowgill's attorney asked that his objection be noted, but no ruling of the court was obtained. At no point in the *voir-dire* proceedings did counsel for Mrs. Cowgill request the court to declare a mistrial or give any admonition to the veniremen or the jury as finally formed. The trial judge may not be put in error for failure to follow a course which the litigant failed to timely move the court to follow.

It is urged for Mrs. Cowgill that the rationale of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, is applicable here, on the theory that a fair cross-section of the community was not had when a jury was selected "solely upon the grounds of whether they would impose a large verdict." It is urged that Temperly v. Sarrington's Adm'r, Ky., 293 S.W.2d 863, be overruled as inconsistent with the rationale of the Witherspoon decision. The court continues to recognize the sound principles enunciated in *Temperly*. The principles rest on the fundamental idea of allowing litigants, through *voir-dire* questioning, to discover whether any prospective juror has any bias or prejudice as to the case to be tried. The control of the *voir-dire* proceedings by the trial judge is to be exercised within the framework of sound judicial discretion. "Mind conditioning" or "brainwashing" of the panel should not be permitted. No hard and fast rule may be declared, but the court is convinced that no abuse of judicial discretion appears from this record.

■ Another attack on the *voir-dire* procedure is the complaint that the trial judge refused to permit Mrs. Cowgill's counsel to question the panel on their willingness to require Rankin's case to be proven by a preponderance of the evidence.

This was actually an effort to emphasize that the burden of proof lay on the plaintiff. The court did not err in this ruling. See Utilities Appliance Company v. Toon's Adm'r, 241 Ky. 823, 45 S.W.2d 478, which recognizes the established rule in Kentucky that the jury should not be told specifically that the burden of proof is on any party. It is enough that the instructions be framed so as to appropriately indicate which litigant has the affirmative burden of persuasion. Mills v. Louisville & Nashville R. Co., 116 Ky. 309, 76 S.W. 29, 25 Ky.Law Rep. 488; Stanley's Instructions to Juries, Volume 1, Section 22.

In the third assignment of error it is charged that the trial judge's "attitude" was "such as to disclose bias on the part of the court," and deprived Mrs. Cowgill of a fair trial. Some of the matters upon which this charge is predicated have been discussed already.

For example, the first claim of bias rests on the court's handling of the *voir dire*, in which the trial judge suggested to Rankin's counsel use of the words "assuming that the evidence and instructions warrant" as a qualification of the question respecting willingness to return a verdict of a quarter million dollars. The court does not construe this as an unwarranted intrusion of the judge as an advocate, but regards it as a proper performance of the judge's duty to expedite the proceedings and avoid needless dispute and delay incident to a relatively inconsequential use of language in a question to the panel.

Next, it is argued that the trial judge cut off Mrs. Cowgill's counsel in his effort to *"voir dire"* the panel when questions touching the burden of proof were forbidden. Since this was legally correct, it certainly is not evidence of judicial bias.

■ It is said in brief for Mrs. Cowgill that "[T]he typewritten record fails to capture the trial scene * * *" and that much of the trial judge's antipathy for Mrs. Cowgill's side of the case is revealed in hearings outside the jury's presence.

These assertions are not sufficient to warrant a finding that the trial judge was guilty of misconduct affecting the jury's consideration of the case. Without further detailing the complaints which are made of the trial judge's activities, it is enough to say that this court is convinced that the trial judge was not guilty of any judicial impropriety or conduct affecting the rights of the litigants.

Next, it is contended that the court erroneously excluded from evidence that Rankin had actually lost no wages from the date of accident until the time of trial. By avowal, and through discovery deposition, it was shown that Rankin received from his employer (as supplemented by workmen's compensation payments) substantially the same amount of money which he would have earned had he been able to work. Some seven thousand dollars plus was paid Rankin after the date upon which his treating physician had testified Rankin could resume a "sitting-down" job. The trial court permitted limited testimony on the subject, reflected in the following excerpt from Rankin's testimony:

"X28: * * * Have you been receiving weekly money since this accident from any source? * * *.

A. Yes, sir.

X29: And is that one of the reasons why you have not made any other efforts to find a job that you can do since January 27, 1969, although Dr. Friesen has testified that sitting down work would not be detrimental to your health?

A. No, sir, I just told you I have tried to find work, yes, sir."

In its verdict the jury awarded Rankin $20,295 for lost wages, the full amount he claimed. The parties have presented helpful briefs discussing the "collateral source doctrine," citing many texts and decisions, including 22 Am.Jur.2d, Damages, Section 208, page 291; 7 A.L.R.3d 516; 58 Ky. Law Journal 36, 161; Hellmueller Baking

Company v. Risen, 295 Ky. 273, 174 S.W.2d 134.

■ The trial court followed the precept of Hellmueller Baking Company v. Risen, supra, by permitting evidence that Rankin had received weekly payments, only as that fact may have indicated malingering by Rankin, if it did. The difficulty is that there was presented a real question as to the legal nature of the payments which Rankin's employer paid to him. If those payments were made because of Rankin's legal entitlement to them, then Rankin did not suffer lost wages to that extent. (Of course, workmen's compensation payments or gratuitous payments cannot be considered as reducing loss of wages.) Since the verdict was itemized, it will be appropriate to reopen so much of the judgment as awards recovery of lost wages for a new trial on the issue of lost wages only. Whether the arrangement between Rankin and his employer was of such nature as to render the payment of wages a legal obligation is a law question for the trial judge. If the evidence generates a fact issue as to whether all or a part of the payments to Rankin by his employer were made because of a legal obligation of the employer to pay them, then a special interrogatory shall be submitted to the jury requiring a resolution of that fact issue. The amount allowed at the original trial for loss of wages shall be credited by such sum, if any, as the jury finds was paid to Rankin by his employer by reason of the legal duty to pay the amount, and the judgment shall be amended accordingly.

■ Finally, as to Mrs. Cowgill's appeal, it is insisted that the verdict of $133,109.70 is excessive. In presenting this point, counsel for Mrs. Cowgill observes:

"Justification for any award of damages can be found in the mind of him who looks at it if he is so inclined. Likewise, this reviewing court can do the same. Frankly, it all depends upon the 'frame of mind' of him who looks at it."

All of this is a candid acknowledgment of the well-settled fact that the determination of the propriety of personal-injury verdicts depends upon the facts in each particular case. See Townsend v. Stamper, Ky., 398 S.W.2d 45, 12 A.L.R.3d 108, and Yankey v. McHatton, Ky., 444 S.W.2d 745.

The verdict of $133,109.70 was itemized by the jury as follows: for medical expenses, $2,814.70; for loss of wages, $20,295; for physical and mental pain and suffering, $25,000; and for permanent impairment of his power to earn money, $85,000.

Rankin was forty years old at the time of the accident. He was then earning $205 per week as a dairy-route salesman. His principal injury was a fragmented, comminuted fracture of the right tibia, with knee-joint involvement. Medical evidence reflected his permanent disability to perform the type of work he had done, because of his inability to climb or walk normally. His physical limitations so reduced his employment opportunities as to result in a weekly diminution of his salary potential by about $100 per week. There was substantial evidence of extended immobilization and attendant pain and suffering. It was the opinion of Rankin's treating physician that permanent use of a long leg brace will be required by Rankin. A definite prospect exists, said the doctor, that degenerative arthritis may occur in the knee area.

There was specific proof as to the medical expenses and the loss of wages. The question as to loss of wages has already been dealt with. There is no claim that the amount is excessive but only a question as to whether Rankin was entitled to recover for loss of wages in the circumstances. As to the $25,000 allowed for pain and suffering, nothing is suggested which indicates that the sum was exorbitant or unreasonable. Considering the pain and suffering which had occurred when the trial took place, and being mindful of the prospect for a lifetime's endurance of discomfort, the court is unable to say that the

award appears at first blush to have resulted from passion or prejudice. The life expectancy of Rankin (nearly thirty-three years), considered with the showing that Rankin's earning capacity had been impaired by about $6,000 per year, dispels the thought that an allowance of $85,000 on that account was excessive.

No merit is found in any of the claims of error asserted in behalf of Mrs. Cowgill; wherefore, the judgment as to her is affirmed.

Rankin's appeal seeks reversal of that portion of the judgment which absolved Blue Grass Boys Ranch of liability. Rankin contends that Mrs. Cowgill as secretary of the corporate Blue Grass Boys Ranch, was negligent in the performance of her duty in behalf of the Ranch; hence, vicarious liability extends to the Ranch according to the usual rule of *respondeat superior*.

For the Ranch, it is argued that the corporation is not legally responsible for any negligence of Mrs. Cowgill, since her activity in wintering the animals was completely independent of her duties as secretary of the corporation, even though the Ranch was the beneficiary of her efforts. It is noted that the Ranch retained no control or right of control over Mrs. Cowgill's handling of the mule and pony.

Mrs. Cowgill's duties as secretary of the corporation did not *per se* embrace the obligation to serve as custodian of the company's animals. Doubtless she undertook the responsibility because of her interest in the Ranch's activities, but it does not follow that she thereby became the agent or servant of the Ranch. It seems clear that Mrs. Cowgill was acting in the capacity of a gratuitous bailee, as was held by the trial court. Even if she were regarded as a "non-servant agent" as discussed in Restatement of Agency, 2d, Sections 219, 220, and 250, the Ranch was not subject to liability because of her actions, since it retained no control or right of control over

her conduct. As noted in Blair v. Boggs, Ky., 265 S.W.2d 795, a bailor who does not retain control of the article bailed is not responsible to other persons for the negligence of the bailee in the care or use of the bailed property. No legal basis appears whereby liability would devolve upon the Ranch in these circumstances.

The judgment is affirmed in the appeal of John W. Rankin v. Blue Grass Boys Ranch, Inc.; the judgment is affirmed in part and reversed in part in the appeal of Ann Caskey Cowgill v. John W. Rankin, and remanded for further proceedings consistent with the opinion.

MILLIKEN, C. J., and OSBORNE, PALMORE and STEINFELD, JJ., concur.

REED, J., concurs in result only.

EDWARD P. HILL, Jr., J., would reverse as on the appeal of John W. Rankin v. Blue Grass Boys Ranch, Inc., feeling that a directed verdict should not have been granted in favor of Blue Grass Boys Ranch, Inc.

NEIKIRK, J., dissents on the ground that the trial court should have directed a verdict in favor of Mrs. Cowgill. In his opinion Rankin did not meet the burden of proving the negligence of Mrs. Cowgill.